**Opinion issued October 10, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00519-CR

————————————

**TIMOTHY J. BLACKWELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 23rd District Court**
**Brazoria County, Texas**
**Trial Court Case No. 64519**

## MEMORANDUM OPINION

A jury convicted appellant, Timothy J. Blackwell, of the second-degree

felony offense of aggravated assault and assessed punishment at two years'

confinement and a $3,000 fine.[1]  Upon the jury's recommendation, the trial court suspended appellant's sentence and placed him on community supervision for two years.   In two issues, appellant contends that (1) the State failed to present sufficient evidence that he threatened Joseph Elzy, the complainant, with imminent bodily injury and (2) his trial counsel rendered ineffective assistance when she failed to subpoena allegedly exculpatory witnesses.

We affirm.

### Background

Around April or May 2010, Joseph Elzy, who was nineteen years old at the time, met A.M., who was fifteen years old, at a party at Texas Southern University. Elzy assumed that A.M., who represented herself as a Louisiana State University student, was over eighteen years old.  Elzy and A.M. left the party and had sex in a friend's dorm room.  They kept in contact after the party and had sex on at least two other occasions.  A few months later, A.M. contacted Elzy and told him that she was actually fifteen years old and that she was pregnant.  In October 2010, Elzy contacted A.M., learned that she had had an abortion, and asked her, via text message, when she was able to have sex again.[2]

---

[1]    *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (Vernon 2011).

[2]    Elzy acknowledged that he had been granted "use immunity" relating to his actions involving A.M.

2

Shortly after Elzy sent this text message to A.M., he was contacted by appellant, A.M.'s former stepfather, who left Elzy a voicemail threatening to involve the police over the situation with A.M. Appellant demanded that they meet the next day to discuss the matter, and Elzy, who knew that appellant was a police officer,[3] agreed to meet him at a Buffalo Wild Wings restaurant in Pearland.

Elzy was outside of Buffalo Wild Wings when appellant and another man, John Minniefield, pulled up in a truck and told Elzy to get in the back seat. Elzy testified that he wanted to speak with appellant inside the restaurant, but appellant did not give him the opportunity to go inside. As they left the parking lot, appellant, who was sitting in the front passenger seat, gave Elzy a printout concerning the law on statutory rape. While he was driving, Minniefield pulled out a gun and placed it on the center console of the truck. Minniefield told Elzy that if his daughter had been involved, "it would have been a different situation" and there "would be no talking." Minniefield drove to the house of Tracey Blackwell, appellant's ex-wife and A.M.'s mother, and appellant and Elzy approached the house to speak with Tracey outside. Tracey chastised Elzy for his involvement with A.M., and Elzy apologized and told her that he did not mean any harm. Appellant then ordered Elzy to get back into the truck.

---

[3] Appellant, who primarily works as a software engineer, testified that he had been a full-time police officer during the 1990s and that he had worked as a reserve officer since 2000.

3

The men returned to Buffalo Wild Wings and Minniefield parked his truck in such a way that it blocked Elzy's car. At this time, appellant pulled out a gun and showed Elzy the fully-loaded clip. Minniefield's gun was still visible on the center console. Appellant cocked the gun, pointed it at Elzy, and said to him, "I'm not like my friend over there. I use mine." Elzy interpreted this to mean that appellant would shoot him. Appellant also told Elzy that he should shoot Elzy in the knees, plant some crack on him, and tell responding police officers that Elzy tried to run. Elzy testified that he was in fear for his life and that he was afraid that the gun could have gone off at any moment. Elzy and the prosecutor then had the following exchange:

[The State]: Were you scared that [appellant] was going to do it [shoot Elzy] right then and there?

[Elzy]: Not right then and there but at that time. At that moment in time he would have not.

[The State]: But not at a later time?

[Elzy]: No, sir.

Appellant then demanded, while still holding the gun, that Elzy pay him $3,000 to cover the cost of the abortion procedure that A.M. had undergone. Elzy agreed "[b]ecause [he] didn't want to go to jail" and because he "didn't want [appellant] to shoot [him] or nothing like that and just say [Elzy] had something on [him]." Appellant took a picture of Elzy's driver's license and social security card with his

4

cell phone, told Elzy that they would work out a payment plan, and ordered Elzy to get out of the truck.

Elzy, who was unable to come up with $3,000 to pay appellant, testified that he began receiving text messages and voicemails from appellant harassing him about the money. Elzy received these messages for approximately one month before he told his mother what had happened. Elzy and his mother eventually reported appellant's actions to the Houston Police Department, which referred the case to the Pearland Police Department.

Appellant testified on his own behalf. He stated that Tracey told him about the encounters between A.M. and Elzy and informed him that Elzy continued to contact A.M. even though he had been warned not to do so. Appellant was "very upset" and contacted Elzy himself. Appellant stated that Elzy was the one who requested a face-to-face meeting, and he agreed to meet Elzy in order to pass on some information about Elzy to the Pearland Police Department. He testified that Minniefield came to his house for an unrelated reason on the day of the meeting. He explained the situation to Minniefield and requested his presence at the meeting with Elzy so appellant could have a witness, as well as someone to hold him back if he lost his temper. Appellant testified that he did not bring a gun with him to this meeting.

5

Appellant testified that he wanted to speak inside Buffalo Wild Wings, but Elzy insisted that he wanted to speak inside the truck so no one else could hear the conversation. Appellant stated that he told Elzy that he wanted to beat him up, but he denied ever actually threatening to beat Elzy up. While in the truck, appellant called Tracey and then brought Elzy to Tracey's house so she could warn him not to contact A.M. again or come onto their property. He testified that both he and Elzy got out of the car and spoke with Tracey for less than five minutes. Appellant and Minniefield then dropped Elzy off at his car at Buffalo Wild Wings. Appellant denied physically intimidating or threatening Elzy when they arrived back at Buffalo Wild Wings, and he denied ever pulling a gun on or threatening to shoot Elzy. He acknowledged that Minniefield owns a gun, but he testified that he did not see a gun inside the truck on that night.

The jury convicted appellant of aggravated assault, assessed punishment at two years' confinement and a $3,000 fine, and recommended that the trial court suspend the sentence. The court placed appellant on community supervision for two years.

Appellant moved for a new trial and argued that his trial counsel rendered ineffective assistance by failing to call Tracey Blackwell as a witness and by failing to subpoena Minniefield, who had also been charged with aggravated assault arising out of this incident. Appellant attached Tracey's affidavit, in which

6

she averred that she met with appellant and Elzy. She averred that Elzy got out of the truck to speak with her. She further averred, "I didn't see any guns in the car and [appellant] did not have any guns on him. So far as I know neither [appellant] nor [Minniefield] had any guns or threatened or coerced [Elzy] in any way to get [Elzy] to apologize to me." Although appellant stated in his motion for new trial that an affidavit from his trial counsel was attached, no such affidavit appears in the record.

Tracey testified at the motion for new trial hearing. She testified that when she met with Elzy, he got out of the car, apologized to her, and promised to reimburse her for A.M.'s abortion. She did not see any weapons during her conversation with Elzy and appellant. On cross-examination, Tracey reiterated that she did not see any weapons, but she also stated that she "never even went close to" the truck and that she "couldn't even see who was driving the vehicle." She did not get in the truck and ride around with appellant, Minniefield, and Elzy. She agreed that she was not present at the time the charged crime was committed.

Trial counsel did not testify at the motion for new trial hearing. Furthermore, although appellant alleged that trial counsel was ineffective for failing to subpoena Minniefield, Minniefield did not testify at the motion for new trial hearing, nor did appellant attach an affidavit from Minniefield to his motion

7

for new trial, stating what he would have testified to at trial if called as a witness. The trial court denied appellant's motion for new trial, and this appeal followed.

## Sufficiency of the Evidence

In his first issue, appellant contends that the State failed to present sufficient evidence that he threatened Elzy with imminent bodily injury.

### A. *Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the

evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistences in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

## B.   *Aggravated Assault*

To establish that appellant committed the offense of aggravated assault, the State was required to prove that appellant intentionally or knowingly threatened Elzy with imminent bodily injury and used or exhibited a deadly weapon, namely, a firearm, during the commission of the assault. *See* TEX. PENAL CODE ANN. § 22.01(a)(2) (Vernon 2011); *id.* § 22.02(a)(2) (Vernon 2011). Evidence establishing that the complainant perceived a threat, coupled with proof that the defendant made a threat, is sufficient to sustain a conviction for aggravated assault by threat. *See Olivas v. State*, 203 S.W.3d 341, 350 (Tex. Crim. App. 2006); *Dobbins v. State*, 228 S.W.3d 761, 766 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd, untimely filed). In determining whether the defendant threatened the

9

complainant, "the crucial inquiry is whether the assailant acted in such a manner as would, under the circumstances, portend an immediate threat of danger to a person of reasonable sensibility." *Boston v. State*, 373 S.W.3d 832, 840 (Tex. App.—Austin 2012, pet. granted). Threats may be communicated verbally as well as by conduct. *Tidwell v. State*, 187 S.W.3d 771, 775 (Tex. App.—Texarkana 2006, pet. stricken).

"The gist of an assault offense is that the defendant 'acts with intent to cause a reasonable apprehension of imminent bodily injury.'" *Fagan v. State*, 362 S.W.3d 796, 798 (Tex. App.—Texarkana 2012, pet. ref'd) (quoting *Dobbins*, 228 S.W.3d at 766). The focus of the inquiry in assault-by-threat cases is "whether the threat was 'imminent'—not merely whether the threat was conditional." *Tidwell*, 187 S.W.3d at 774. "Imminent" includes "near at hand, mediate rather than immediate, impending." *Id.* at 775 (citing *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989)). Aiming a deadly weapon at a complainant is sufficient evidence of a threat to sustain an aggravated assault conviction. *Ward v. State*, 113 S.W.3d 518, 521 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd); *Anderson v. State*, 11 S.W.3d 369, 375–76 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *see also Fagan*, 362 S.W.3d at 799 ("The act of pointing a loaded gun at an individual is, by itself, threatening conduct which supports a conviction for aggravated assault.").

10

Elzy testified that both appellant and Minniefield displayed guns while the men were driving around in the truck. Elzy stated that Minniefield, while driving, pulled out a gun and placed it on the center console. Minniefield informed Elzy that, if his daughter had been involved, "it would have been sort of a different situation" and there "would be no talking."

Later, after the men stopped at Tracey Blackwell's house and arrived back at the Buffalo Wild Wings, appellant pulled out a different gun and showed Elzy the clip. Elzy testified that appellant

> put the bullets or the clip in and he cocked it back and he was like hey, man, I ain't like my partner over here. I use mine. He was like I should shoot you in your knees and tell the police you were trying to run. He was like I should shoot you in your knees and tell the police you tried to run and place some crack on you.

Elzy testified that the gun was fully loaded, that appellant cocked the gun and pointed it at him, and that appellant told him, "I'm not like [Minniefield]. I use mine." Elzy interpreted this statement as, "I'm dead. Like he'll shoot me." Elzy testified that he felt like the gun could have gone off at any time, that appellant could have killed him if he wanted, and that, because appellant was a police officer, appellant could shoot him and stage the scene to make it appear as if Elzy had drugs or was trying to run away. He unequivocally stated that he was in fear for his life. He then had the following exchange with the prosecutor:

> [The State]: Were you scared that [appellant] was going to do it [shoot Elzy] right then and there?

11

[Elzy]: Not right then and there but at that time. At that moment in time he would have not.

[The State]: But not at a later time?

[Elzy]: No, sir.

Appellant contends that this last exchange between the prosecutor and Elzy—specifically, Elzy's response, "Not right then and there but at that time. At that moment in time he would have not."—is evidence that any threat of bodily injury was not imminent. Appellant also cites the Court of Criminal Appeals' decision in *Devine* for the proposition that any threats made to Elzy were future, "conditional" threats that were not imminent and do not support an aggravated-assault conviction. *See* 786 S.W.2d at 269. In *Devine*, the defendant repeatedly called her ex-husband and demanded money, threatening that he would have his head "blown off" or his house bombed if he did not comply. *Id.* At the request of police officers, Devine's ex-husband set up a face-to-face meeting with her, at which officers arrested her. *Id.* Devine appealed her robbery conviction, contending that the State failed to present evidence of threats of imminent bodily injury. *Id.* at 270. The Court of Criminal Appeals agreed with Devine, reasoning that her threats were "of future harm only" and noting that, at the face-to-face meeting, she did not "take any overt action, such as displaying a weapon." *Id.* at 269, 271.

12

Appellant's argument and reliance on *Devine* ignores the particular circumstances of this incident, which support a conclusion that, despite Elzy's belief that appellant would not shoot him precisely at that moment, bodily injury was "near at hand, mediate rather than immediate, [and] impending." *See Tidwell*, 187 S.W.3d at 775; *see also Williams v. State*, 827 S.W.2d 614, 616 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (contrasting assault statute—requiring defendant to threaten another with imminent bodily injury—with robbery statute—requiring defendant to place another in fear of imminent bodily injury); *Trevino v. State*, 752 S.W.2d 735, 736–37 (Tex. App.—Eastland 1988, pet. dism'd) ("It is not necessary that the complainant be placed in fear of imminent serious bodily injury; it is the appellant's threat, made with the intent to place the complainant in fear of imminent serious bodily injury, that constitutes the offense.").

Elzy's testimony established that he was in a confined space, Minniefield's truck, with two men, both of whom were much larger than him,[4] who each had handguns in their possession. Appellant indicated his willingness to use his gun when he told Elzy that, unlike Minniefield, he uses his gun. Appellant also showed Elzy that the gun was fully loaded, and he pointed the gun at Elzy's face while musing that he could shoot Elzy in the knees and tell police that Elzy was trying to

---

[4] Elzy described Minniefield as a large man. Appellant agreed and also stated that he himself is a "big guy." He also testified that Elzy looked like he weighed 130 to 150 pounds, so he "had no need for a gun" when confronting Elzy.

run away or he could shoot Elzy and plant crack on him. Elzy testified that he was in fear for his life and that he was afraid that the gun could go off at any time. Elzy's testimony that appellant pointed a loaded gun at him is sufficient, by itself, to sustain an aggravated-assault-by-threat conviction. *See Fagan*, 362 S.W.3d at 799; *Ward*, 113 S.W.3d at 521; *Anderson*, 11 S.W.3d at 375–76; *see also Cantu v. State*, 953 S.W.2d 772, 775 (Tex. App.—Corpus Christi 1997, pet. ref'd) ("[T]he act of pointing a loaded gun at an officer in pursuit is, by itself, threatening conduct which supports conviction for aggravated assault. Proof of verbal threats is unnecessary.") (internal citations omitted).

Viewing all of the evidence in the light most favorable to the verdict, as we must when conducting a sufficiency of evidence review, we conclude that a rational jury could have found beyond a reasonable doubt that appellant intentionally and knowingly threatened Elzy with imminent bodily injury.[5]

We overrule appellant's first issue.

---

[5] Appellant also contends that the evidence is insufficient to support the conviction because he consistently testified at trial that he did not possess a gun on the night of the incident and that he did not threaten or physically intimidate Elzy. This testimony directly conflicts with Elzy's testimony. In a sufficiency of the evidence review, we resolve all conflicts in the evidence in favor of the verdict. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

14

**Ineffective Assistance of Counsel**

In his second issue, appellant contends that his trial counsel rendered ineffective assistance when she failed to call Tracey Blackwell as a witness and to subpoena John Minniefield.

### A.    *Standard of Review*

To establish that trial counsel rendered ineffective assistance, an appellant must demonstrate, by a preponderance of the evidence, that (1) his counsel's performance was deficient and (2) there is a reasonable probability that the result of the proceeding would have been different but for his counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010); *Cannon v. State*, 252 S.W.3d 342, 348–49 (Tex. Crim. App. 2008).  The appellant's failure to make either of the required showings of deficient performance and sufficient prejudice defeats the claim of ineffective assistance.  *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *see also Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

The appellant must first show that his counsel's performance fell below an objective standard of reasonableness.  *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App.

1999). The second prong of *Strickland* requires the appellant to demonstrate prejudice—"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Thompson*, 9 S.W.3d at 812. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

We indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and, therefore, the appellant must overcome the presumption that the challenged action constituted "sound trial strategy." *Id.* at 689, 104 S. Ct. at 2065; *Williams*, 301 S.W.3d at 687. Our review is highly deferential to counsel, and we do not speculate regarding counsel's trial strategy. *See Bone v. State*, 77 S.W.3d 828, 833, 835 (Tex. Crim. App. 2002). To prevail on an ineffective assistance claim, the appellant must provide an appellate record that affirmatively demonstrates that counsel's performance was not based on sound strategy. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *see Thompson*, 9 S.W.3d at 813 (holding that record must affirmatively demonstrate alleged ineffectiveness).

In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions. *Mallett*, 65 S.W.3d at 63; *see also Massaro v. United States*, 538 U.S. 500, 505, 123 S. Ct.

16

1690, 1694 (2003) ("If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. The trial record may contain no evidence of alleged errors of omission, much less the reason underlying them.") (internal citations omitted). Because the reasonableness of trial counsel's choices often involves facts that do not appear in the appellate record, the Court of Criminal Appeals has stated that trial counsel should ordinarily be given an opportunity to explain his actions before a court reviews the record and concludes that counsel was ineffective. *See Rylander*, 101 S.W.3d at 111; *Bone*, 77 S.W.3d at 836.

### B.   *Failure to Call Witnesses*

When challenging trial counsel's failure to call a particular witness, the appellant must show that the witness had been available to testify and that her testimony "would have been of some benefit to the defense." *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007) (per curiam) (quoting *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004)); *Barnett v. State*, 344 S.W.3d 6, 14 (Tex. App.—Texarkana 2011, pet. ref'd) ("A claim of ineffective assistance based on trial counsel's failure to call a witness cannot succeed absent a showing that the witness was available to testify and that the witness' testimony would have

benefitted the defense."); *Cate v. State*, 124 S.W.3d 922, 927 (Tex. App.—Amarillo 2004, pet. ref'd) ("The general rule is that the failure to call witnesses does not constitute ineffective assistance of counsel without a showing that the witnesses were available to testify and that their testimony would have benefitted the defendant."). To establish ineffective assistance on this basis, appellant must do more than merely allege that a particular witness could have presented exculpatory testimony. *See Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007) ("Appellate counsel's conclusory allegation in the Motion To Abate recounting appellant's out-of-court assertion in correspondence to her 'that trial counsel failed to call a named material witness in his defense and failed to conduct the promised investigation' did not establish any facially plausible claim of ineffectiveness of trial counsel.").

Here, Tracey Blackwell testified at the motion for new trial hearing. She testified that appellant brought Elzy to her house, the three of them had a brief conversation, and Elzy then left with appellant. She stated that she did not see any weapons during this encounter. On cross-examination, she specified that appellant and Elzy got out of the truck and walked up to the house. She acknowledged that she never went in the truck, never "even went close to" the truck, and could not see who was driving the truck. She agreed with the prosecutor that she was not present when the assault against Elzy was committed.

Although appellant presented the substance of what Tracey would have testified to, he has not established that this testimony would have benefitted his defense. *See Ramirez*, 280 S.W.3d at 853; *Barnett*, 344 S.W.3d at 14. Tracey's testimony, in which she testified that she did not go near the truck and was not present at the time of any threats to Elzy, does not contradict Elzy's testimony that appellant possessed a gun while in the truck with Elzy and Minniefield and threatened Elzy with that gun. Thus, appellant has not established that his trial counsel rendered ineffective assistance when she failed to call Tracey as a witness. *See Ramirez*, 280 S.W.3d at 853; *Barnett*, 344 S.W.3d at 14; *see also Cooks*, 240 S.W.3d at 912 (holding that conclusory allegation that counsel failed to call material witness for defense did not establish ineffective assistance).

Further, although appellant argues that Minniefield "could have been called to testify as to whether the Appellant actually had a gun" and that Minniefield's "testimony could have contradicted that of Elzy," Minniefield did not testify at the new trial hearing, nor did appellant submit an affidavit by Minniefield for consideration with his motion for new trial. Thus, the record contains no indication of what, exactly, Minniefield's testimony would have been. Appellant's characterization of Minniefield's hypothetical testimony as exculpatory is thus entirely speculative. Because appellant failed to establish that the testimony of Minniefield, who was also under indictment for his role in the incident, would have

19

benefitted his defense, he has not demonstrated that his trial counsel performed deficiently when she failed to call Minniefield as a witness.[6]  *See Ramirez*, 280 S.W.3d at 853; *Barnett*, 344 S.W.3d at 14.

We conclude that because appellant failed to establish that Tracey Blackwell's and John Minniefield's testimony would have benefitted his defense, he has not established that his trial counsel rendered ineffective assistance when she failed to call these witnesses.  *See Ramirez*, 280 S.W.3d at 853; *Barnett*, 344 S.W.3d at 14; *see also Thompson*, 9 S.W.3d at 813 (holding that record must affirmatively demonstrate alleged ineffectiveness).

We overrule appellant's second issue.

### Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Do Not Publish.  TEX. R. APP. P. 47.2(b).

---

[6]  In arguing that he was deprived of a defensive theory by his counsel's failure to call Minniefield, appellant argues that his counsel failed to contact Minniefield prior to trial.  At the new trial hearing, however, appellant testified that trial counsel originally represented both himself and Minniefield, although Minniefield ultimately procured other representation.